The cause was continued for advisement; and now, at this adjournment, the Court delivered their opinions as follows, viz.
Sewall, J.
The facts material in deciding upon the motion in this case for a new trial are, that the insurance by the policy in question was of the ship Columbia, owned for two thirds by the plaintiffs, and one third by the master, for a voyage from Spain to Teneriffe, and at and from thence to Jamaica; that the ship in the course of the voyage insured was captured by the French, and recaptured by the English, who carried the vessel and cargo to the island of Antigua, where, upon a libel for salvage, they were decreed to be restored to the former owners, upon payment of the one half of their value to the recaptors; that the master, soon after his arrival at Antigua, and again during his stay there, advised the insured ot the capture of the ship and cargo; that the cargo was taken out and sold there, and that the vessel was also sold, under a *43 decree of the Admiralty, at the instigation of the master, upon an alleged want of funds to pay the salvage; that the master became the purchaser of the ship, and returned in her to Boston, where she has since become the joint property, or is in the joint management and control of the insured and the master as before; that the assured, before bringing this action, offered to abandon to the underwriters all interest in the proceeds of the sale of the ship, but refused to abandon the ship.
Upon these facts the jury at the trial were directed to find a verdict for the insured as for a total loss. This direction * is complained of on the part of the defendants, who move [ * 50 j for a new trial.
The demand of the plaintiffs for a total loss is resisted by the defendants upon two grounds: because, 1st, the insured, at the time of their offer to abandon, had no right to abandon and to recover for a total loss; and, 2dly, if they then had the right, they have not entitled themselves to recover for a total loss, by their abandonment of the net proceeds of the sale of the ship, when the ship itself had been recovered, and was in safety in their possession and use, in consequence of a purchase by their partner and agent, either origi nally made for them, or which has availed to their benefit.
It seems admitted in the argument for the defendants, and if it were not, I think it unquestionable, that the events in this case, up to the time of the captain’s purchase of the ship, constituted a technical total loss, if the assured had elected so to consider it. A capture and recapture, subjecting the property recovered to a charge of half its value to be paid upon the restoration of the vessel at a port out of the course of the voyage insured, where the cargo procured for the voyage was necessarily discharged and sold; and when by these events the voyage itself was entirely defeated,—are circumstances constituting a technical total loss, according to many decisions which might be cited. I shall mention only the cases of Goss Al. vs. Withers, 2 Burr, 683, and Milles vs. Fletcher, Doug. 219. But a loss of this kind is total only at the election of the insured ; and the rule adopted upon this subject is, that the election of the insured is to be made and notified as soon as may be after he has intelligence of the state of his property.
If the advice addressed by the captain from Antigua to the insured had been received by them before the arrival of the ship at Boston, their neglect to notify the insurers was a forfeiture of the right of abandonment.
This rule and the application of it were very fully discussed in the case of Mitchel &f Al. vs. Eddie, 1 Term R. 608, and the doctrines of that decision were recognized and enforced in the case of *44 Livermore, Assignee of Bartlett, vs. the present defendants, [ * 51 ] recently decided by this Court (16). * But the facts before us do not warrant a conclusion that the insured had received any advice of the state of their property, until the return of their captain and vessel to Boston. And whether they could then abandon and demand a total loss, is a question to be decided upon the other circumstances of this case.
It the purchase of the captain may be considered in the event a recovery of the ship to the insured, it became so by their assent to it after his return, and the consequent restoration of the property to its original state. The purchase was not at the time necessarily or professedly for the account of the insured, nor does the general authority of a master extend to the power of binding his owners in a purchase of that kind; and there is no pretence of any special authority in this case. Nor will the mere safety of the vessel, ii the insured refuse to accept it, when the voyage has been entirely defeated, deprive the owner insured for a particular voyage of the right of abandonment. All the decisions in cases of detention by embargo, where a total loss has been recovered upon the insurance of vessels remaining in safety (17), and particularly the judgment by the King’s Bench in the case of Rotch vs. Edie (18), are authorities to this effect.. The case of Goss & Al. vs. Withers (19) may be cited to the same purpose.
The case of Poole vs. Fitzgerald (20) has been relied on; but upon examination it will not be found to warrant a contrary doctrine. That was the case of an insurance upon a privateer for a cruise of four months, the vessel valued at £1000, without further account, and free from average. By the mutiny and desertion of her crew, the cruise was prevented for a part of the term insured ; but the vessel remained in safety at her accustomed port. The decision was against the plaintiff, the insured, grounded upon the peculiar terms of the policy, which was construed to entitle the insured to recover only in the event of a total loss ; the policy being for the sum insured without. account, and free of average; and it being impossible that the loss should be considered total, while the vessel itself remained in safety.
[ * 52 ] *Upon the ground, then, that the return of the ship to Boston was not for the account of the insured, unless by their election to receive it of the captain; and that the loss of the voyage insured, with the other facts stated, would entitle them to demand a total loss by the policy in this case, upon a suitable aban *45 donment of the actual salvage, it seems necessary to come to the remaining question, whether there has been such an abandonment; and I have authority to say that the direction complained of was a decision upon this question only. It was the apprehension of the justices who presided in the trial, that in a decision not final upon any question of law, they were to govern themselves by the decisions of this Court, which have been cited in the cases of Welman vs. Gray, and Storer vs. Gray.
The acceptance by the assured of their shares in the ship purchased by their partner and general agent, was an assent equivalent in all respects to a previous authority; and having a retroactive effect, whatever had been done by the master of the vessel and the partner of the insured, in purchasing and refitting the vessel, and in prosecuting another voyage, is to be considered as the acts also of the insured in the disposal of their property, whether recovered and held in their former right, or by a new and distinct title.
If the purchase in this case was, in its effect upon the contract of insurance, a recovery of the property, to be treated as a recovery in the former right of the insured, their acceptance and subsequent disposal of the ship, and especially their refusal to abandon it to the insured, was a waiver of the right of abandonment. And upon the same reasoning an abandonment of the sales at Antigua was insufficient, because not made of the actual salvage, the ship recovered.
On the other hand, if the ship returned to the assured by a new and distinct title, affecting the insurers in their contract, as well as all other persons, then the loss continued in every respect total at the time of the offer to abandon ; and the abandonment offered in this case was valid and sufficient to entitle the insured to recover for a total loss.
When the case of Storer vs. Gray was decided, I had the honor to be a member of this Court, and I concurred in the * decision. The case was similar, in many respects, to the [ * 53 ] present; differing only in the circumstances of a decree compelling a sale ; whereas, in the present case, the sale was made at the instance of the party purchasing under it. That decision was, as I recollect, upon these grounds, that the decree of a court of admiralty in a foreign country, having jurisdiction in a case of capture and recapture, ordering a sale for payment of salvage, was in itself a change of property; that the master, either with or without the assent of his owner, the insured, might avail himself by purchasing at an authorized and compulsory sale ; and in any purchase made for the account of the insured party, he would become the owner in a new right; that the master had no general authority to purchase at the risk, or for the account of the insured, or the *46 insurers; and that they could not justly claim the benefit of a purchase made by the master at his own risk; and a prevailing argument was, that these principles had governed the Court in the priai decision, which has been cited, in the case of Welman vs. Gray.
It must be allowed, I think, that there are difficulties attending any rule that can be contemplated for the decision oL cases of the kind which have been cited. If it should be decided that the insured were by a purchase of this kind, when fairly made for their account, chargeable absolutely with a new risk, very great and obvious objections occur on their part. And in adopting a rule less objectionable, which has been urged upon the attention of the Court, it is obvious that an agent by necessity, proceeding with fair intentions, for the apparent benefit of the concerned, may become a sufferer by his agency, and involve himself in expenses, from which, in a different event, he could derive no emolument, contrary to the maxim, cujus est commodum, ejus est onus. On the other hand, the Court have never been inattentive to the circumstance, that in their decisions which have been cited, as well as in the present case, the allowance of a total loss upon a policy, where the subject matter of it has been actually recovered at a comparatively small expense, gives an advantage to the assured, inconsistent with the principle, that contracts of insurance are to be construed and carried into effect as contracts of indemnity.
[ *54] *The decision by Lord Kenyon, in the case of M’Masters vs. Shoolbred, leaves that principle unimpaired, and confines the insured to an indemnity. In that case a vessel, insured for six months, was, after capture, but without any regular condemnation, sold by the captors and purchased by the master for the account of his owners. Lord Kenyon considered the master as the agent of the owners, and the vessel as recovered for their account, and the price paid as a salvage or ransom constituting an average loss.
The principle of this decision has been recognized in the Supieme Court of the state of New-YorJc, in the cases of Saidler &f Craig vs. Church, and of Abbot vs. Broome, and in the Court of Errors of that state in the case of Robinson & Hartshorne vs. The United Insurance Company. In those cases, purchases (or circumstances very similar to what are stated in the case before us) made by a master or general agent of the party insured, for the account of the concerned, were deemed recoveries of the property insured upon the original right of the owner; and when the purchase was accepted and confirmed by him, to be for his account; and to be for the account of thé insurers, when accepted by them after law fui abandonment. It is observable, however, that in the cases men *47 tioned, with the exception of Saidler & Craig vs. Church, which in this respect goes beyond the English precedent in M’Masters vs. Shoolbred, there was no condemnation or compulsory sale of the property, by a regular decree of the Court of Admiralty. In the present case, the sale was not originally decreed, but was procured at the instance of the master acting for the concerned, and becoming afterwards the purchaser. Whether this circumstance makes an essential difference or not, between this case and the decisions of this Court which have been cited, it is unnecessary now to determine. Upon the general principle of not exceeding an indemnity to the assured, and upon the reason, rather than the direct authority of the cases cited, I am better satisfied to be able to form my opinion from what is known of the substantial condition of the property for which an indemnity is claimed, rather than from the formal changes of the title evidenced by writings managed solely by the party claiming a beneficial * interest under them, [ * 55 ] to the loss and injury of the party against whom the claim is made.
And upon the whole, my opinion in the case before us is, that a sale, procured at the instance of the master having charge of a vessel in a foreign port where he becomes a purchaser at a price very inadequate to the value of the vessel, when restored to her formel owners, is made for their account, if they elect to receive the vessel ; and that by receiving it they waive their right of abandonment, and cannot afterwards entitle themselves to recover for a total loss ; because these proceedings, in any question between the owners and their insurers, are to be construed a recovery of the property by the owners in their former right. I am therefore in favor of granting a new trial.
Sedgwick, J.
[After briefly recapitulating the facts in the cause.] The jury were directed that the plaintiffs, upon the foregoing facts, were entitled to recover as for a total loss; and they found a verdict accordingly. If this direction was right, the verdict ought to stand, and judgment to be rendered conformably to it; but if the evidence proves that the plaintiffs are entitled to recover for a partial loss only, then a new trial must of course be granted.
Two reasons are given why there ought to be a new trial.
1. Because from the evidence in the case there is reason to apprehend that the captain practised fraud, in procuring the sale of the ship., by order of the Vice-admiralty Court; although no question relative thereto was made at the trial.
2. Because the Court directed a verdict for the plaintiffs as for a total loss, when, admitting all the evidence to be true, they had sustained a partial loss only.
*48 As to the first question, whether the evidence will warrant a suspicion of fraud, or whether, if it does, as it was all known to the defendants at the trial, and no question on that ground was then raised, it would be proper now to send the case back for a new trial, I give no opinion; because, should a new trial be had for that reason only, and the question of the fraud of the master be negatived, we should then be met with the great question in the [ *56 ] case, and obliged to decide it. * Besides, this course of procedure would, in the mean time, leave a very important principle of the law of insurance unknown and uncertain among those concerned in this branch of commerce, and the effects of that uncertainty could not fail to be embarrassing and mischievous. From this consideration, it has become the duty of the Court, however unpleasant, under the circumstances, the performance of it may be, by a decision to put this question at rest.
The question to be determined is, whether such facts and eircum stances were proved at the trial, as entitled the plaintiffs to recover as for a total loss. By sustaining the motion for a new trial, this question was considered by the Court as not definitively settled by the cases of Welman vs. Gray, and Storer vs. Gray, which have been cited and pressed upon the consideration of the Court; otherwise it is obvious that it would have been absurd to have received the motion and permitted it to have been argued. We have heard it argued repeatedly and ably. We have taken time to deliberate, and have given the subject much consideration, and the result we are now to pronounce.
It was attempted by the counsel for the defendants to distinguish this case from those of Welman vs. Gray, and Storer vs. Gray, as in the former there was a condemnation before the sale, and in thr latter there was a compulsory process to compel the sale; neither of which circumstances attended or preceded the sale in this case. Whether both or either of those cases are thereby distinguishable from this, I give no opinion ; and as they may again be brought before the Court, it would be wrong to do it.
As an insurance is a contract of indemnity, and nothing more ; as this is an attempt to recover more than ten times an actual indemnity ; as the sale was at the instance of the master, who was a part owner; as, by the restoration to the other owners, the plaintiffs, it is evident that the purchase was intended for the joint benefit of all the owners; as, by the plaintiffs’ acceptance of the ship, they ratified the captain’s act, and by retrospection the purchase must be considered as made jointly by the plaintiffs and the captain ; so that there never was a moment from the time of the con- * 57 ] tract till the * offer of .abandonment, such as it was, *49 was made and refused, that the property in the ship was altered ;—it would, in my opinion, violate the very nature and chief principle of the law of insurance, and subvert the main intention, and destroy the utility of the contract, to authorize a recovery for a total loss, when in fact a very inconsiderable partial loss only has been sustained.
On the part of the plaintiffs it is contended that a sale in pursu ■ anee of a legal order of court, in all cases, operates a change of property; and that it is indifferent whether the purchase be made by the owner, the assured, or by a stranger, that by the capture the plaintiffs had a right to abandon, which right was not affected by the recapture, as by it the recaptors were entitled to one half the value of the ship for salvage, being the amount of salvage to which American recaptors were, by a statute of the United States, at that time entitled; and that, by the purchase, the ownership of the plaintiffs was by a title altogether distinct from, and independent of, that which was insured by the policy.
I cannot but observe that if such a sale as that under consideration is of the nature, and to be followed by the consequences contended for, a door will be opened for the practice" of fraud, in all cases difficult, and in many impossible to be detected. A master in a distant region, by address and fraudulent representations, may obtain, under the most false pretences artfully disguised, an order of a judge to sell his vessel. This may be in a port where there are few or no buyers, and of consequence he may become the purchaser for a mere trifle, come home, and on abandoning the proceeds of the sale, retain the vessel, and receive her full value of the underwriters. This would be a commerce equally profitable and iniquitous, to which the establishment of such a principle would afford motives too strong in all cases to be resisted. To this it may be answered, that if the purchase be made by a stranger, by collusion with the captain, the same mischiefs will take place. It is true; but then it is equally true, that in a strange country it will be difficult to form such a combination, and, if formed, it is more easily detected than the same fraud would be, if practised by the captain alone; *and surely no facility ought to be afforded to [ *58 ] the practice of frauds so injurious to commerce. To support this principle no authority has been shown, and it is presumed none can be, unless the cases before referred to of Storer vs. Gray, and Welman vs. Gray, may be supported to warrant it; and I have already observed that, by permitting this case to be argued the Court has determined that it was not definitely settled by those cases.
*50 In the case of Milles vs. Fletcher (21), Lord Mansfield said that he took great pains in delivering the opinion of the court in the cases of Goss vs. Withers, and Hamilton vs. Mendes; that he had, upon that occasion, read both those cases; and that he thought that from them the whole law between insurers and insured, as to the consequences of capture and recapture, might be collected.
The cases mentioned by Lord Mansfield were argued by the most able counsel in England, before the most learned court in Europe, at the head of which was the greatest man that probably ever sat in a court of justice. The law of nations, the law of England, and the laws of the other maritime nations of Europe, were all taken into consideration, and principles established which have ever since, I believe, been considered as perfectly sound and well founded. After an interval of twenty years (22), these principles are revised and reconsidered by the same court, and again receive their unanimous and unqualified approbation. Such principles, so deliberately adopted, and so gravely pronounced, ought not, for slight reasons, to be violated. If they remain unshaken, the present case must, I think, be governed by them.
In the case of Goss vs. Withers (23), Lord Mansfield says, “ The insurer runs the risk of the insured, and undertakes to indemnify; he must therefore bear the loss actually sustained, and can be liable to no more. So that if, after condemnation, the owner recovers the ship, in her complete condition, but has paid salvage, or been at any expense in getting her back, the insurer must bear the [ * 59 ] loss so *“ actually sustained.” Here the true principle is laid down and illustrated. If the owner recover the ship in her complete condition, the insurer must pay the loss actually sustained, and he is liable to no more. In the case under consideration, the loss actually sustained was less than a thousand dollars; and this, according to the rule established, is all the plaintiffs ought to recover. The demand, instead of one thousand, is ten thousand dollars. A.nd this rule of apportioning the damages to the amount of the Jamnification, is to govern even after condemnation (24), which is certainly as efficacious, to divest the owner of his property, as a sale, as was the case here, at the instance of one of the owners, and a purchase by him, for, and on account of the joint owners, which was afterwards ratified by them. The owners did, after all the loss had happened, and before the pretended offer to abandon, recover *51 the ship “ in her complete condition.” And it is afterward, in the same case (25), observed that “ in questions upon policies the nature of the contract, an indemnand nothing else, is always liberally considered.” That surely could hardly be considered as a liberal construction of a contract, which is entered into for the purpose of indemnity and nothing else, where he, who has the subject, for which the indemnity is stipulated, restored to him, in its complete condition, refuses to deliver it, and demands ten times the amount of the damnification: it would not be a liberal„ construction which should determine that a demand so unreasonable was to be satisfied.
In the case of Hamilton vs. Mendes (26), Lord Mansfield, in delivering the opinion of the court, says, “ The plaintiff’s demand is for an indemnity. His action then must be founded upon the nature of his damnification, as it really is at the time the action is brought. It is repugnant, upon a contract of indemnity, to recover for a total loss, when the final event has decided that the damnification in truth is an average, or perhaps no loss at all.” No words, which could have been selected, would, with more precision, have decided the question under consideration, against the plaintiffs.
* Lord Mansfield adds that “ whatever undoes the [ * 60 ] damnification, in whole or in part, must operate upon the indemnity in the same degree.” Now, in this case, the whole damnification to the assured, if the ship had been actually lost, would have been 10,000 dollars ; but the purchase by one of the owners, for the benefit of all, and her restoration to them in her complete condition, for less than 1,000 dollars, so far undid the damnification, and must of course, if the authority of the case of Hamilton vs. Mendes be respected, operate upon the indemnity in the same degree. In other words, the total is thereby reduced to an average loss.
The court, as if anxious to determine that the restoration of a ship, in her complete condition, to the assured, before abandonment, defeated his right to abandon, further say, “ The notion of a vested right, in the plaintiff, to sue as for a total loss before the recapture, is fictitious only, and not founded in truth. For the insured is not obliged to abandon in any case. He has an election. No right can vest as for a total loss till he has made that election. He cannot elect before advice is received of the loss; and if that advice shows the peril to be over, and the thing in safety, he cannot elect at all; because he has no right to abandon, when the thing is safe.” In this case the plaintiffs did not “ elect to abandon” the ship, but *52 refused. When the demand was made as for a total loss, the ship was in safety, and in the possession of the plaintiffs.
it is further added, “ Writers upon the maritime law are apt to embarrass general principles with the positive regulations of their own country ; but they seem all to agree that if the thing is recovered before the money paid, the insured can only be entitled according to the final event.”
Lord Mansfield, to express as strongly as he could, how altogether without foundation was the contrary doctrine, says (27), “ The present is the first attempt that ever was made to charge the insurer with a total loss, upon an interest policy, after the thing was recovered.” And in the same page he adds, “ that if the thing in truth [ *61 ] was safe, no artificial reasoning * shall be allowed to set up a total loss.” He afterw'ards says that (28) “ without dwelling upon principles and authorities, the consequences of the present question are decisive. It is impossible that any man should desire to abandon, in a case circumstanced like the present, but for one of two reasons, viz., either because he has overvalued, 6r that the market has fallen below the original price. The only reasons, which can make it the interest of the party to desire, are conclusively against allowing it.” And what, I ask, is the object of the present action ? Certainly to recover more than an actual indemnity, and as that would be a violation of the very essence of the contract it is “ conclusive against allowing ” the demand, for with precision the true rule is laid down (29). “ The insurer, by the marine law, ought never to pay less, upon a contract of indemnity, than the value of the loss ; and the insured ought never to gain more.” According to the dictates of justice and common sense, it is said that “ the daily negotiations and property of merchants ought not to depend on subtilties and niceties, but upon rules easily learned, and easily íetained, because they are the dictates of common sense, draws, from ihe ts-uth of the case.”
The chief justice concludes one of the most able and enlightened arguments that he ever delivered, in these remarkable words : “To obviate too large an inference being drawn from this determination, I desire that it may be understood that the point here determined is, that the plaintiff, upon a policy, can only recover an indemnity, according to the nature of his case, at the time of the action brought, or (at most) at the time of the offer to abandon.” The application of what I have cited from these cases is so obvious, and so exactly - suited to the case under consideration, that any additional, observa *53 ticms would be not only useless, but a misapplication of our time. These opinions have never, hitherto, since they were delivered, been called in question; and, unless they are erroneous, they must be decisive in this case. These cases are cited by both Park (30) and Marshall (31), who * are among the most [ * 62 j intelligent, able and learned elementary writers, in their treatises on the law of insurance, with approbation.
The case of M’Masters vs. Shoolbred (32) is, in my opinion, in principle, directly in point. It was an action of assumpsit, on a policy of insurance. The insurance was on a ship called The Four Brothers, to commence from the 17th of March, 1793, for six months, from any port. The ship was valued at £1000.
It was proved, that the ship sailed from New Brunswick with a cargo of fish for Barbadoes, and was captured by the Ambuscade, a French frigate, and carried into Charleston, in the United States, where she remained upwards of a month, and was then sold by the authority of the French consul there, as a prize, by public vendue, and purchased by the captain (who had been exchanged) for £380, on account of the owners. In addition to this sum, so paid for the vessel, £230 were paid by the captain, after he had purchased her, for necessary repairs at Charleston, and for fitting her out again for a voyage ; after which she sailed for Jamaica.
Lord Kenyon, before whom the case was tried, said it was impossible to make this more than an average loss. That a policy of insurance was a contract of indemnity, to which, and which only, had the insured a right to look. This was the language of Roccus ; and its principle had been adopted in every decision on the subject. This was not only the decision of an able and learned judge, but it was confirmed, afterwards, by the whole court. For at the next term, when a new trial was moved for on the matter of law, it was considered that the question was so very clear, that a rule to show cause was refused. This case is cited by Marshall (33) as undoubted law ; and the principle decided by it he lays down in these words:— “So, if a ship be sold by the captors, and the captain, acting as agent for the owners, purchase the ship on their account, this shall be considered as recovering the ship for the owners, and the money thus paid as salvage ; and if the voyage be prosecuted, this is only a partial, and not a total loss.” It is impossible not to perceive * that the case under consideration is brought [ *63 ] precisely within this rule. This cannot be denied ; but it is said that the case of M’Masters vs. Shoolbred is distinguishable from this, inasmuch as the French consul had no legal authority to *54 exercise judicial powers, in the condemnation, or in directing the sale of captured vessels at Charleston, which was within the limits of a neutral country; whereas the sale, in this case, was in pursuance of a legal order of a court of vice-admiralty. To, this I answer, in the first place, that this is a circumstance not at a3 adverted to either by the counsel or the judge, and does, in fact, make no part of the case, and that, in the next place, I apprehend that, in the reason and nature of the thing, it makes no sort of difference; that purchases and sales by a captain, if authorized by the existing circumstances, and made in the exercise of a sound and reasonable discretion, and for the interest of those concerned, must have the same construction, and be followed by the same consequences, whether made with or without an order of court. And this I think is proved by the case of Milles vs. Fletcher (34). In that case, in which the sale was the act of the captain without any order of a court, it was determined that a ship and goods, being insured for a voyage, if the ship be taken and recaptured, and on the recapture, the captain acting fairly, and for the benefit of his employers, sells the ship and cargo, and thereby puts an end, to the voyage, the insured shall recover as for a total loss. And surely it cannot be supposed, if the acts of the captain should, in that case, operate against the insurer, that equal justice does not require that in this case, he should not receive the benefit of them. Lord Mansfield, in delivering the opinion of the court, says, “ The captain, when he came to New York” (the place of the sale), “ had no express orders, but he had an implied authority, from both sides, to do what was right and fit to be done, as none of them had agents in the place; and whatever it was right for him to have done, if it had been his own ship and cargo, the underwriters must answer for the consequences of, because this is within the contract of indemnity.”
[ * 64 ] *In the year 1799, the case of Saidler Craig vs. Church, involving the very principle now under consideration, was determined before the Supreme Court of the state of Neiv York—a court very respectable for learning and talents, and much conversant in questions of insurance. The case is not reported, but what the facts and the decisions were, appears in the report of the case of Abbot vs. Broome (35). The facts are shortly these—The vessel, in the due course of her voyage insured, was captured by a French privateer, and carried into Guadaloupe, and thereby the voyage was totally lost. At Guadaloupe the vessel was duly libelled in the Admiralty Court, and condemned, and after condemnation was *55 purchased by the master, as for the account of the owners, for the sum of 1120 dollars. The master was also a part owner. The owners had since fitted out the vessel, and sent her on another voyage. As soon as the owners knew of the capture, and before they were informed of the condemnation, or of the purchase by the mas ter, they gave the underwriters notice of abandonment (36). It was determined that the assured had adopted the act of the captain as their own, and had thereby waived the abandonment, and had converted the total into a partial loss. If a restoration of the vessel, under those circumstances, was a waiver of an abandonment previously made, no one will doubt, that if the restoration precede the abandonment, it must destroy the right to abandon. Much information might be drawn from this case of Abbot vs. Broome ; but this opinion is already grown to an unexpected length.
There is one more case, which I will mention, determined in the same court—that of the United Insurance Company of New York vs. Robinson & Al. (37). In that case it was adjudged that, after an abandonment and payment of loss, a purchase of the property insured, by the agent or correspondent of the owner, though made after condemnation, is for the benefit of the insurer, if he elects; and that, therefore, the proceeds of a purchase so made, and any cargo, in which they may be invested, become, if he pleases, his property, and he * may maintain trover for it [ * 65 ] against the insured. It is most apparent, with what strength the decision last mentioned supports the principle contended for by the defendants, and to what length it carries it. This decision, however, is considered by the Court, and I think justly, as a consequence irresistibly flowing from the judgment in the case of Saidler & Craig vs. Church. The judgment in The United Insurance Company vs. Robinson & Al. has been affirmed in the Court for the Correction of Errors (38).
I mention these cases determined in a sister state, because it would be with much reluctance that I should feel myself bound to establish a rule, upon a subject so important as that of insurance, in opposition to one I found already established in a contiguous state so commercial as that of New York, and established by judges so respectable as I know them to be.
The case of Story & Al. vs. Strettell (39), determined in Penn sylvania in 1764, is confirmatory of the same principle.
But it is urged for the plaintiffs that they are entitled to íeeover as for a total loss, because the voyage was lost. This claim is found ed upon the judgment of the Court of King’s Bench in the case of *56 Manning vs. Newnham (40). This case was an insurance on the ship Grace, her cargo and freight, “ at and from Tortola to London, warranted to depart on or before the first of August, 1781. The ship valued at £2,470, the cargo at £12,400, and the freight at £2,250, at 25 guineas per cent, to return 10 per cent., if she departed with convoy from the West Indies and arrived; the ship, freight, and goods warranted free of particular average.” The ship by sea damage, being a peril insured, was soon obliged to put back into Tortola. The injury to the ship was irreparable, and no other ship could be procured for the cargo: the freight of course was lost: the cargo was sold for a sum within £700 of its value, and two thirds of it pv*-'.based by the owners. The insured claimed a total loss, and recovered. Lord Mansfield, in pronouncing judgment, said [ * 66 ] that the court were of opinion that the voyage * was totally lost; and that that was the ground of their determination. What was said must be taken in relation to the facts in the case. The insurance was on the ship, cargo, and freight. The ship was wholly disabled, the freight lost, and, what was the great object, the transportation of the cargo completely defeated.
It is impossible not to perceive the difference between that case and the one under consideration. In this last, the ship, on which alone was the insurance made, is in perfect safety, restored in her complete condition to the owners, and by them refused to be abandoned to the underwriters.
But the general position in this case, and which is laid down by elementary writers on the subject of insurance, that the assured are entitled to recover as for a total loss because the voyage is lost, has relation to a class of cases, as I apprehend, totally distinct from the one under consideration. In the case of M’Masters vs. Shoolbred, which has been already mentioned, the original voyage, which was intended to carry a cargo of fish to Barbadoes, was completely defeated, and the ship was fitted out for a new voyage to Jamaica. Yet it was determined that it was impossible to make the loss more than an average loss.
Suppose that the owner of a ship and cargo should insure by distinct policies on the ship and cargo, on a voyage from London to the United States ; that the ship should be captured on her voyage, the cargo condemned, and she restored and arrive in safety, and in good condition, and so come into the possession of the owners, no abandonment having been made ; and that the loss upon the cargo should be paid. It would, I believe, be against the very nature of *57 the contract of insurance, to authorize the assured to abandon the ship, and to recover as for a total loss of her ; and yet the supposed case is in nothing different in principle, that I can perceive, from that under consideration.
It is very true, that in case of an embargo, or a capture, while they continue, and also during any obstruction of a voyage, from a cause within the contract of insurance, if the continuance be unknown, and not within the control of the assured, fie may, where the insurance is on the ship, abandon her: but if such causes of detention cease, and the ship be * restored to [ * 67 ] the use of the assured, and is received by him, or his agent, in good condition, the right to abandon ceases also.
And the case of Pole vs. Fitzgerald (41) is directly in point to prove that this insurance must be considered as an insurance on the ship, and not an insurance on the voyage. That was an insurance on the body, tackle, &c., of the Goodfellow privateer, lost or not lost, from Jamaica to any ports or places, during four calendar months, beginning the adventure on the ship, from the 14th of June then last, and to continue until the ship, with her tackle, &c., should arrive at any ports or places where or whatsoever, or cruising from port to port or place to place, during the term, without further account, and free from average. The ship valued at £1000. The insurance was against the usual perils. The ship sailed on the voy age and cruise insured, and after taking a prize, within the term insured, the crew mutinied against their commander and officers, and by force, against their will, carried her back towards Jamaica, and before her arrival in port there seized the boat, fire-arms, &c., carried them off, and deserted the ship, by which the cruise was totally lost for the remainder of the term insured. The action was brought for a total loss. In the King’s Bench the plaintiff recovered ; but upon a writ of error being brought in the exchequer chamber, the judgment, by the unanimous opinion of the eight judges, was reversed, and their judgment was afterwards affirmed in the house of lords. The decision is, therefore, of the highest possible authority. The question was, whether it was an insurance of the ship and voyage, or an insurance of the ship only; and the decision of the court was, that the insurance was on the ship only ; and that she being in safety, the plaintiff could not recover.
The chief justice, in delivering the opinion of the Court, undertook to prove that the notion, that the voyage was insured by an insurance of the ship, was absurd ; and among other consequences which he points out, he says, “ In the first place it would be a double insurance *58 —both on the ship, and on the voyage; for if the ship were [ * 68 ] lost before *the end of four months, the term insured, to be sure the voyage is lost; and if the voyage be lost, according to the plaintiff’s construction, though the ship”- (as in the present case) “be in good safety at the end of the four months, yet the insurance must be forfeited ” (42). And so very unreasonable did the claim of the plaintiff appear to the chief justice, that lie said, “ If it were necessary to give my opinion of them,” (policies on a voyage) “ I should think (according to my present sentiments) that if a policy were so drawn, as that a voyage were insured by express words, such a policy would be void, both as illegal and unreasonable.”
Upon the most mature consideration I am of opinion that the evidence in the case did not warrant a verdict for a total loss, and that therefore there must be a new trial.
Sedgwick, J.,
then observed that this opinion, as delivered by him had been submitted to his brethren, Thatcher and Parker, justices and that they fully concurred in it, and in the reasons adduced by him in support of it.
The chief justice, having been of counsel in the cause, gave no opinion (43).
New trial granted.

 Ante, vol. 2. 232.

 Marshal, 439, 441, 488, 505.

 6 Term R. 425.

 2 Burr, 683.

 Willes’s Rep. 641.—5 Brown’s Parl. Cases, 131.—Park, 170.—Marshal, 504.

 Doug. 220.

 Goss vs. Withers was determined in 1758; Hamilton vs. Mendes, in 1761, and Milles vs. Fletcher, in 1779.

 2 Burr. 694.

 Park, 159.

 Ibid ’97.

 2 Burr. 210

2 Burr 1212.

 age 1213.

 Page 1214

 Pages 148,157.

 Pages 486, 491.

 1 Esp. Rep. 237

 Page 501.

 Doug. 219.

 1 N. Y. Term R. 292

 Page 297, in the note.

 2 N. Y. Term R. 230.

 1 Johnson’s Rep. 592.

 1 Dallas’s Rep 10

 Parl, 169.—Marshall, 505. S. C

 Willes's Rep. 641.

3) Page 647.

 [Hughes, 225, 226, 408.—Smith, Merc. Law, 215.—McIver vs. Hendreson, 4 M & S. 576.—Cologan vs. L.A. Co. 5 M. & S. 447.—Patterson vs. Ritchie, 4 M. & S 393 Queen vs. Union Ins. Co. Condy Marsh, 582. n.—Ed.]